ROWLEY v. NEWBURGH LIGHT, HEAT & POWER CO. et al.

(Supreme Court, Appellate Division, Second Department. May 24, 1912.)

1. MASTER AND SERVANT (§ 286*)—INJURY TO SERVANT—SAFE PLACE—NEGLI-
    GENCE.

It may be found that a master was negligent in its duty as to a safe place to work, its superintendent having put an employé at work on its field under an electric power wire, 25 feet above the ground, with a drill having an iron handle 27 feet long, it having taken no steps to find out, as it could by telephone, whether the power was off, but having merely told the power company that the season of its manufacturing, power for which was furnished over said wire, was over, and that it might cut off the supply; no absolute promise to cut it off having been given.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1010–1050; Dec. Dig. § 286.*]

2. MASTER AND SERVANT (§ 97*)—PROXIMATE CAUSE.

The electric power company, which supplied a brick company with electricity through a wire over, and 25 feet above, the brick company's field, could not have reasonably expected that as a consequence of its not deadening the wire, when notified that the brick company's season was over, an employé of the brick company would be injured by being placed at work under the wire with a drill having an iron handle 27 feet long, so as to make any negligence in not cutting off the current the proximate cause of the accident.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 163; Dec. Dig. § 97.*]

Appeal from Trial Term, Orange County.

Action by Catherine Rowley, administratrix of Edwin James Rowley, deceased, against the Newburgh Light, Heat & Power Company and the Arrow Brick Company. From a judgment for plaintiff, and from an order denying motions for new trial, defendants appeal. Affirmed as to brick company; reversed as to other defendant.

Argued before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

Frank Verner Johnson, of New York City, for appellant Newburgh Light, Heat & Power Co.

Henry Bacon, of Goshen, for appellant Arrow Brick Works.

R. H. Barnett, of Newburgh, for respondent.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs..1907 to date, & Rep'r Indexes

JENKS, P. J. The plaintiff's intestate was killed by an electric shock when working for his master, the defendant Arrow Brick Works. The electric current was furnished to the said master by the defendant Power Company. The judgment is upon a verdict against both defendants, and both appeal.

[1] I think that the judgment against the master must be affirmed. The Power Company had built a subpower station near the works of the master, and had installed in that station transformers, meters, switches, and other apparatus. It also had built from its main line a branch transmission line of three wires across unoccupied land of the master, 25 feet above ground, and suspended upon cross-arms on poles 100 feet apart. A current of 13,000 volts was thus transmitted to the said substation, where it was reduced and transmitted to the machinery of the master. On November 12, 1909, the master's superintendent, Leonard, with the intestate and a fellow servant, were boring in the said unoccupied lands for clay, using a drill with an iron handle 26 feet 11 inches long. Leonard directed that the drill be raised out of the bore temporarily and held upright, so that he could examine the auger at the end of the drill. The intestate and his companion obeyed the order, and thus held the drill while Leonard proceeded to the examination. They held it with their bare hands. Those of the intestate were above those of his companion. In an instant the deceased fell dead, and Leonard and the other man were stricken down unconscious. Immediately after the casualty the iron handle of the drill was found leaning against the overhead wires. There is no doubt that the casualty was due to the electric shock transmitted by contact of the handle of the drill with the overhead wires. The master's superintendent knew of the existence of these wires and of their purpose. He selected as a spot for prospecting a place almost directly beneath them. He directed that the drill, which with its metal handle held from the ground perpendicularly was almost two feet higher than the wire, be raised out of the ground and held upright temporarily. He testifies that he knew that, when a drill was thus held perpendicularly, it had tipped on other occasions more than once. He testifies that at this time he thought the wires were dead; that he did not think anything about the power when he went to select this place; that he took it for granted "it was all off" when he was close to the wires. There is no evidence that the master took any steps to ascertain whether the wires were alive with electricity at this time or to deaden these wires. There is evidence of certain practical steps which could have been taken by Leonard or some other employé of the master to ascertain whether the wires were alive at this time, and there is also evidence that the condition of the wires could have been ascertained by use of a private telephone between the master's works and the Power Company's place, designed to facilitate the business done between them.

Vann, J., for the court in Kirby v. Montgomery Bros. & Co., 197 N. Y. 31, 90 N. E. 53, says:

"The duty of using reasonable care to provide a reasonably safe place for his servant to work in is cast by law upon the master, and the same degree

135 N.Y.S.—60

of care is required of him to inspect the place and keep it safe. Whatever source of danger the master would discover by reasonable inspection, he is presumed to know, and constructive notice, through the lapse of time, has the same effect as discovery by actual inspection. The knowledge of his superintendent clothed with general powers is the knowledge of the master, and his negligence in failing to inspect and remedy is the negligence of the master."

In McGovern v. C. V. R. R. Co., 123 N. Y. 288, 25 N. E. 375, Ruger, Ch. J., for the court says:

"When directing the performance of work by the servant in a place which may become dangerous, and such danger may be foreseen and guarded against by the exercise of reasonable care and prudence on the part of the master, it is his duty to exercise such care and adopt such precautions as will protect the servant from avoidable danger. This is the master's duty, and, however he may choose to exercise it, whether through the supervision of a superintendent or some lower grade of employment, it still continues his duty, and not until he shows that it has been properly performed can he claim exemption from liability for injuries occasioned by its nonperformance. Laning v. N. Y. C. R. R. Co., 49 N. Y. 521–532 [10 Am. Rep. 417]; Corcoran v. Holbrook, 59 N. Y. 517 [17 Am. Rep. 369]."

I think that the jury could have found that the master fell short of its obligation in that its superintendent should have been seen that these wires were free from lethal current before he put the servant to work at the place selected in drilling with such an instrument as was furnished for that purpose. But it is contended that Leonard had the right to rely upon "the promise made to him on the 30th of October that the electricity would be cut off; particularly in view of the fact that he had seen the employés of the Light Company working about the plant and dismantling it." The contract between the Brick Works & Power Company provided as follows:

"The purchaser will pay for all electricity used, as shown by recording watt meters, at the rate of three cents per horse power hour. Bills to be paid monthly within ten days of presentation of bill; and it is understood that the company will present and the purchaser will pay a minimum monthly bill of one hundred dollars ($100) during each of the months of the purchaser's brick season of each year during the term of this contract. It is the intention of the purchaser to install four electric motors of 20 H. P. capacity, or greater, and the purchaser agrees to use electricity from the company for the purpose of operating his motors for a term of five years, and the company agrees that there will be no increase in the rate of electricity under this contract, or any renewal of same."

There is proof that the brick season begins late in April or early in May, and closes ordinarily about November 1st. But the contract does not provide that the current should be supplied only during the brick season, for the only mention of that season is with reference to the minimum amount that would be paid. I fail to find the evidence of any absolute "promise." The manager of the Power Company says that they did receive a notice about October 30th to cut off the supply when they were through the season; but that no changes had been made up to the time of the accident, save that they had removed some of the transformers and a meter at the substation. He further testifies that they could physically cut it off, but only at a time when no power was in use between Newburgh and Marlboro, that they would have to wait when it was convenient for other manufacturers, other

consumers, to discontinue for a short time and then physically cut or break this off; that, while the actual work was simple, the delay was in shutting off their power and getting a man out there, some five miles, and, while the actual operation of change was doing, every customer would be without service. The same witness testifies that the word received was that the Brick Company were through with the use of the power for the season, and there was not an order to discontinue this line of wires from the trunk line. Hannan, superintendent of distribution, testifies that he did not recollect ever having received any request from the Brick Works for discontinuance. Leonard the superintendent, testifies that on October 30th he told the Power Company that they were through making brick, and that they could shut the power off for the season, and that they said, "All right, they would attend to it." But, even if Leonard had given such directions, it could not as matter of law be held that the defendant had discharged its obligation to its servant, and was not bound to ascertain whether the electric current had been cut off before it put him to work at that place. These various circumstances were all for the jury.

[2] Without objection or dissent, the learned court submitted that the "sole question" of the negligence of the Power Company was whether it was negligent "in having a current of electricity passing over those wires at that time, to wit, the morning of the 12th of November, 1909? Not as to the equipment of the wires at all, not as to the extent of the amount, but was it wanting, in the exercise of ordinary care, in having the current there at all at that time? If it was not, why then there was no negligence on the part of the Power Company." Subsequently the counsel for that company requested the court to charge "that the defendant Power Company was not obliged to anticipate that an iron pipe 26 feet and 11 inches long would be placed in this field where it could come in contact with the wires." The court inquired of the plaintiff's counsel, "What do you say to that?" and the counsel answered, "I ask your honor to decline it. The court: Declined. Exception." I think this exception was well taken and is fatal, for upon this disposition of the request the jury could infer that the law was that the Power Company "was obliged to anticipate that an iron pipe 26 feet and 11 inches long would be placed in this field where it could come in contact with the wires." But there is no proof whatever of any fact that justifies an inference that the defendant had the slightest reason to believe that any such contact would ever be made. In McKenzie v. Waddell Coal Co., 89 App. Div. 416, 85 N. Y. Supp. 819, we said:

"Of course, it is not essential to liability that the contemplation or anticipation should be of the particular consequences, but, nevertheless, the accident must be of such a nature as 'might reasonably be apprehended' from the failure to take the precaution in question. Lilly v. N. Y. C. & H. R. R. Co., 107 N. Y. 566, 575 [14 N. E. 503]."

I cannot see in this record justification for charging this defendant upon the sole question of negligence submitted to the jury. There is no question but that the wires were lawfully in their place, properly suspended, and in good order. The accident was due to the facts (1)

that the other defendant went to prospect in this open field; (2) that it selected a spot in the ground beneath the wires; (3) that the iron drill happened to be 26 feet 11 inches high; (4) that in withdrawing the drill it tipped and happened to fall against the live wires 25 feet high. The only possible relation of this defendant to the accident was the continuance of the current after the notification which I have described. The learned counsel for the respondent writes in his points:

"The plaintiff does not seek to predicate liability against the Brick Company because of any negligence on the part of the Power Company in failing to have discontinued the transmission of power over the lands of the Brick Company within a reasonable time after having been so directed by Leonard on October 30, 1908, but she does contend that the omission of the Power Company in that respect was one of the proximate causes of the accident and Leonard's negligence another."

Would any reasonable man expect to occur, as the consequence of not deadening these wires, after the other defendant had notified them that he did not wish to use the current in its business, that an accident of such a nature might be the consequence? If the result was not within the ken of reasonable prudence and foresight, then proximate cause is not established. Beetz v. City of Brooklyn, 10 App. Div. 382, 41 N. Y. Supp. 1009, and authorities cited. I have heretofore discussed this principle and cited the authorities in McKenzie v. Waddell Coal Co., 89 App. Div. 415, 85 N. Y. Supp. 819, and Saverio-Cella v. Brooklyn Union El. R. Co., 55 App. Div. 98, 66 N. Y. Supp. 1021.

The judgment and order as to the Arrow Brick Works must be affirmed, and as to the Newburgh Light, Heat & Power Company be reversed and a new trial be granted, costs to abide the event. All concur.